**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-432 RBW** |
| **v.** | : | |
| | : | |
| **NICO CLARY,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Nico Clary to 45 days of incarceration, 24 months of probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Nico Clary, a 47-year-old assistant facilities manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Nico Clary pled guilty to one count of Entering and Remaining within a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by Nico Clary (1) bringing her son to participate with her; (2) climbing past other rioters to make it to the Upper West Terrace; and (3) remaining on the Upper West Terrace for an extended period of time.

The Court must also consider that Nico Clary's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Clary's crime support a sentence of 45 days of incarceration followed by 24 months of probation.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 39, p. 1-3 (Statement of Offense).

### Defendant Clary's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Nico Clary appeared in open-source video walking north on 15th Street, N.W., and turning east on Pennsylvania Avenue, N.W., to walk to the Capitol. On that day, she wore a red baseball cap, a white puffy coat, brown knee-high boots, and carried a pink flag. *See* Figure 1.



*Figure 1: Defendant, circled in yellow, walking north on 15th Street, N.W.*

Nico Clary approached the restricted grounds along Pennsylvania Avenue, N.W., where she took a position alongside her son atop the Peace Monument at around 2:00 p.m.



*Figure 2: Defendant atop the Peace Monument, facing the Capitol.*

Nico Clary spent approximately 24 minutes at this location until jumping down and walking closer towards the Capitol. Nico Clary walked along the Pennsylvania Avenue Walkway and headed up the Northwest Stairs towards the Upper West Terrace. There was congestion at the narrow stairwell, but Nico Clary climbed atop the balustrade and moved past her fellow rioters. At the middle landing of the Northwest stairs, Nico Clary snapped some photos of her son waving his Gadsden flag from atop the balustrade.



*Figure 3: CCTV at approximately 2:45 p.m. Defendant seen photographing her son.*

Nico Clary moved off the balustrade and then continued up to the Upper West Terrace, moving closer to the Capitol building. Nico Clary entered through the Senate Wing Door at approximately 3:21 p.m. Once inside, Nico Clary moved toward the connecting corridor between the Senate Wing and the Crypt; again, she took a photo. *See* Figure 4. At the time of her photo, the Senate Wing connector was filled with officers wearing helmets, with an alarm blaring when rioters breached the door.



*Figure 4: CCTV at approximately 3:24 p.m. Defendant taking a photograph of the chaos.*

Nico Clary then slowly returned to the Senate Wing Door, and exited at approximately 3:27 p.m.

*See* Figure 5.



*Figure 5: CCTV at approximately 3:27 p.m. Defendant exiting through Senate Wing Door.*

Once outside, again on the Upper West Terrace, Nico Clary remained in place until the police formed a line and pushed all off of the terrace.

*The Charges and Plea Agreement*

On December 13, 2023, the United States charged Nico Clary by a one-count Information with violating 18 U.S.C. 1752(a)(1). On February 29, 2024, pursuant to a plea agreement, Clary pled guilty to the Information. By plea agreement, Clary agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Nico Clary now faces a sentencing. As noted by the plea agreement and the U.S. Probation Office, she faces up to one year of imprisonment and a fine of up to $100,000. Nico Clary must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

**IV.    The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Adjustment for certain zero-point offenders | <u>-2</u> |
| Total Adjusted Offense Level | 2 |

*See* PSR at ¶¶ 37 – 45.

While the Government concedes that Section 4C1.1 applies to Clary, the Court should vary upward by two levels to account for the reduction under 4C1.1. Importantly, the Application Notes for Section 4C1.1 provides a useful example that is applicable in the present case. It reads: "For example, an upward departure may be warranted if the defendant has a prior conviction or other comparable judicial disposition for an offense that involved violence or credible threats of violence." § 4C1.1 Application Note 2. Although not scored because of the amount of time that has passed, one of Nico Clary's prior convictions is for "Aggravated Battery/Police/Fire/DOC/DHS/Bureau County Circuit Court, Princeton, IL." PSR at ¶ 49. The upward variance is appropriate in the present case.

Further, although §4C1.1 took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is

accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Clary's criminal history in category I. PSR at ¶ 51. Accordingly, the U.S. Probation Office calculated Clary's total adjusted offense level, after acceptance, at 2, and her corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 101. Clary's plea agreement contains an agreed-upon Guidelines' calculation that closely mirrors the U.S. Probation Office's calculation, though the Probation Office's calculation does not include the variance given the prior violent conviction.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days of incarceration, with 24 months of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

9

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Clary's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Clary, the absence of violent or destructive acts is not a mitigating factor. Had Clary engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Clary's case is that she brought—and encouraged—her son to take part in the riot. She climbed on the Peace Monument, she climbed on the balustrade, and she took photos of his actions. Her conduct as a parent was the wrong sort of encouragement.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Clary's History and Characteristics

Although Clary's upbringing was difficult, her prior criminal conduct ended at the time of her marriage to Xyan's father. She remains employed, though she has specifically requested that her current employer not be informed of these criminal charges. Despite her tumultuous past, she has remained compliant while on pretrial release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on

10

our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

The peaceful transfer of power, "is a solemn and most momentous occasion, and yet in the history of our nation it is a commonplace occurrence." Ronald Reagan, Inaugural Address 1981. The uniqueness of the United States—as described by President Ronald Reagan—was attacked on January 6, 2021. "The orderly transfer of authority as called for in the Constitution routinely takes place, as it has for almost two centuries, and few of us stop to think how unique we really are. In the eyes of many in the world, this every-four-year ceremony we accept as normal is nothing less than a miracle." *Id*.

The history of our nation has seen many different political parties. But throughout our history each has agreed to the basic tenants of our founding. As eloquently stated by our first president, "The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government." George Washington, Farewell Address 1796. As President Washington continued,

> All obstructions to the execution of the laws, all combinations and associations under whatever plausible character with the real design to direct, control, counteract, or awe the regular deliberation and action of the constituted authorities, are *destructive of this fundamental principle and of fatal tendency*. They serve to organize faction; to give it an artificial and extraordinary force; to put in the place of the delegated will of the nation the will of a party, often a small but artful and enterprising minority of the community; and, according to the *alternate triumphs of different parties, to make the public administration the mirror of the ill concerted and incongruous projects of factions*, rather than the organ of consistent and wholesome plans digested by common councils and modified by mutual interests. (emphasis added).

Although the events of January 6, 2021, was a first, the struggle in creating this more perfect Union has been a continuing struggle.

The struggle of correctly addressing the crimes of January 6, 2021, is the same struggle this country has faced since its infancy. Although the public administration of imposing a sentence for the crimes of January 6 has become the "mirror of the ill concerted," more is lost when these crimes are treated differently than if they are treated similarly to crimes outside of the January 6 context.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

This defendant's criminal history reflects her personal life circumstances. Two of her previous crimes are related to alcohol. The current case does not appear to be one that is driven by reliance on alcohol or other substances.

Unlike many individuals, Nico Clary not only breached the restricted perimeter, traveled further than the West Plaza, climbed on top of the Peace Monument, and traveled up the Northwest Stairs. She entered the Capitol building through blaring alarms and around lines of officers. Nico Clary contributed to the chaos at the Capitol building and seized the opportunity of the police's inability to physically stop her. By standing at a vantage point above others on the Peace Monument, she had a front row seat to the chaos at the Capitol, and then—united with her son—travelled into that maelstrom.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Clary based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Clary has pled guilty to the one-count Information charging a violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Matthew Mazzocco*, 21-cr-054 TSC (D.D.C. 2021), a defendant was sentenced to serve a period of 45 days incarceration following his plea of guilty to a single misdemeanor offense.[3] In *Mazzocco*, the defendant entered the Capitol through the same door as in the present case. Although the defendant in *Mazzocco* entered deeper into the Capitol than in the present case, there was not evidence that the defendant climbed structures on the grounds.

In *United States v. Jennifer Schwab*, 21-cr-050 CRC (D.D.C. 2022), the defendant entered the Capitol at approximately the same time as in the present case, 3:21 p.m. But the defendant in *Schwab* entered through a *different* door containing an alarm and officers. In *Schwab*, the defendant entered through the East Rotunda Door, and moved into the Rotunda and Memorial Door, before exiting the building approximately 7 minutes later. In *Schwab*, the defendant also pled guilty to a single misdemeanor offense with the same final range, but the guidelines level was 8 as opposed to the present case where the level is 2.[4] The Court there imposed a sentence of 45 days incarceration, followed by one year of supervised release.

---

[3] The defendant in *Mazzocco* pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), a class-B misdemeanor.
[4] The defendant in *Schwab* pled guilty to a violation of 18 U.S.C. § 1752(a)(2), a class-A misdemeanor.

In *United States v. Mariposa Castro*, 21-cr-299 RBW (D.D.C. 2022), this Court was presented with a defendant that observed what was occurring at the Capitol and left her hotel room to join. In *Castro*, the defendant entered the Capitol through a window immediately outside the site of the most violence on January 6, the Lower West Terrace Entrance. The defendant there also pled guilty to a single misdemeanor offense.[5] But unlike the defendant in *Castro*, Nico Clary was outside the Capitol for hours. Instead of the evidence of her statements encouraging other rioters, surveillance captures her snapping a photo of her son waving the Gadsden Flag with the Capitol in the background. This Court, in *Castro*, imposed a sentence of 45 days of incarceration and a $5,000 fine.

The same criminal decision-making that occurred in *Castro* is present here. Clary observed what was occurring and still took her son closer to the building. Clary remained nearly the same amount of time in the building as the defendant in *Schwab*, and ultimately entered the same door as in *Mazzocco*. In each of those case, Courts have imposed 45 days incarceration. The same is proper here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

---

[5] The defendant in *Castro* pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G).

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Clary must pay $500 in restitution, which reflects in part the role Clary played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects,

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Clary's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VII.    Fine

Nico Clary's conviction for violating 18 U.S.C. § 1752(a)(1) subject her to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Nico Clary's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where Nico Clary establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Nico Clary to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Nico Clary has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $200 to $9,500. U.S.S.G. § 5E1.2(c).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days incarceration with 24 months' probation. Such a sentence promotes respect for the law, and deters future crime,

by imposing restrictions on Clary's liberty as a consequence of her behavior, while recognizing the acceptance of responsibility for her crime.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:               */s/ Adam M. Dreher* _____

<div style="margin-left: 40%;">

ADAM M. DREHER
Assistant United States Attorney
Michigan Bar No. P79246
601 D St. N.W.
Washington, D.C. 20530
(202) 252-1706

</div>